**J. Harvie WILLIAMS et al., Plaintiffs,**

**v.**

**VIRGINIA STATE BOARD OF ELECTIONS, etc., et al., Defendants.**

**Civ. A. No. 4768–A.**

United States District Court
E. D. Virginia,
at Alexandria.

July 16, 1968.

Howard S. Spering, Washington, D. C., Robert L. Montague, III, Alexandria, Va., for plaintiffs.

Robert Y. Button, Atty. Gen. of Virginia, Richmond, Va., Robert D. McIlwaine, III, Richard N. Harris, Asst. Attys. Gen. of Virginia, Richmond, Va., for defendants.

Before BRYAN, Circuit Judge, and LEWIS and MERHIGE, District Judges.

ALBERT V. BRYAN, Circuit Judge:

Presidential electors provided for in Article II of the Constitution of the United States cannot be selected, plaintiffs charge, by a statewide general election as directed by the Virginia statute.[1] Under it *all* of the State's electors are collectively chosen in the Presidential election by the greatest number of votes cast throughout the entire State, instead of choosing them by Congressional districts, *one* elector for each, exclusively by the votes cast in that district.

Unfairness is imputed to the plan because it gives the choice of *all* of the electors to the statewide plurality of those voting in the election—"winner take all"—and accords no representation among the electors to the minority of the voters. An additional prejudice is found in the result of the system as between voters in different States. We must reject these contentions.

The Constitution provides for the election of the President and Vice President by electors in these words:

### Article II

"Section 1. \* \* \* He [the President] shall \* \* \* together with the Vice President \* \* \* be elected, as follows:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress; \* \* \*."

---

1. Code of Va., 1950, Section 24–7, quoted infra. The same general plan now prevails in every State.

Article XII [Twelfth Amendment].

"The Electors shall meet in their respective states, and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate; * * *."

Plaintiffs' proposition is advanced on three counts: (1) the intendment of Article II, Section 1, providing for the appointment of electors is that they be chosen in the same manner as Senators and Representatives, that is two at large and the remainder by Congressional or other equal districts; (2) the general ticket method violates the "one-person, one-vote" principle of the Equal Protection Clause of the Fourteenth Amendment, i. e., the weight of each citizen's vote must be substantially equal to that of every other citizen. Gray v. Sanders, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed. 2d 821 (1963); Wesberry v. Sanders, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); and (3) the general ticket system gives a citizen in a State having a larger number of electors than Virginia the opportunity to effectuate by his vote the selection of more electors than can the Virginian. On these bases the plaintiffs pray for a declaration that the Virginia statute is invalid and for an injunction against its use by the defendant State election officials.

The Code of Virginia, 1950, Section 24–7 directs:

"§ 24–7. Electors for President and Vice President.—There shall be chosen by the qualified voters of the Commonwealth, * * * at elections to be held on the Tuesday after the first Monday in November in each fourth year [after 1948], so many electors for President and Vice President of the United States as this State shall be entitled to at the time of such election under the Constitution and laws of the United States. Each voter may vote for one elector from each congressional district of the State, as the same shall be constituted and apportioned for the election of representatives in the Congress of the United States from this State at the time when such election shall be held, and for two electors from the State at large; * * *."

Congress has prescribed that henceforth the Representatives from each State, when more than one, be chosen by districts, 2 U.S.C. §§ 2a, 2c. Similar provision is made by Article IV, Section 55 of the Constitution of Virginia as well as by statute, Code of Va., Section 24–4. Virginia has ten Representatives besides two Senators. Save to analogize the selection of electors with the selection of Senators and Representatives the plaintiffs make no point, of course, against the election statewide of the two electors corresponding to the Senators. Our discussion, therefore, will refer solely to those electors who are the counterparts of Representatives in Congress.

Throughout, it must be kept constantly in mind that the wisdom of the continued use of the electoral college for choosing the President and Vice President is not at issue here. As here posed the question recognizes the predominance of that Constitutional design. The inquiry is whether Article II, Section 1 considered alone or with Constitutional safeguards, permits the selection of the electors by a general election in which the entire electorate of the State may collectively vote at one time upon all of the electors.

Plaintiffs are ten in number, one from each of the Congressional districts of Virginia, and all of them qualified to vote in their respective districts in the coming fall election. Their brief describes their purpose:

"This action is brought to protect and restore the full benefit of plaintiffs' right to vote. Plaintiffs seek to elect one presidential elector in, and solely by a plurality of the votes cast in, their own respective Congressional districts. They seek thereby to prevent the dilution of their own votes, and the denial of any possibility of their having any electoral representation when not part of the state-wide plurality, that now result from counting the votes of all voters throughout the state in determining the plurality of votes for the election of the one presidential elector that has been apportioned to the people resident in their respective Congressional district by virtue of their numbers. Thus, they seek to prevent the votes of residents in other Congressional districts of Virginia from being counted in determining the plurality of votes for the election of one presidential elector in, by, and from their own respective Congressional district."

▮▮▮ We think they have the requisite standing to maintain the suit they plead; that it is an acceptable class action; that the defendants, save the Governor of Virginia, are proper parties, as the officials entrusted with the conduct of the election of presidential electors; and that this court has jurisdiction of the complaint. Flast et al. v. Cohen, Secretary of Health, et al., 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (June 10, 1968); 28 U.S.C. § 1343; 42 U.S.C. § 1983; 42 U.S.C. § 1988; Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); F.R.Civ.P. 23. Because of its special circumstances, we do not think Penton v. Humphrey, 264 F.Supp. 250 (S.D.Miss.1967 —3-judge court) dictates rejection of the present action; nor do we believe on reading of the pleadings in State of Delaware v. State of New York, 385 U.S. 895, 87 S.Ct. 198, 17 L.Ed.2d 129 (1966), cited by the defendants, that it forecloses entertainment of plaintiffs' plaint.

I. The first argument of the plaintiffs is that the college of electors was envisaged by the Constitution as delegates of the people—although to exercise their own judgment—in naming the President and Vice President, thus according the people a truer representation in the choosing of these officers. The electors, they aver, were to be as directly and immediately representative of the people as the college method permitted.

To this extent and to this end, a voice in selection of the President and Vice President, the argument · is, was avouched the people in the same measure as is assured them in picking members of the legislative branch of the Federal government. If, continue plaintiffs, Representatives in Congress are—in fairness to the people—chosen by districts, so should be electors.

Primary citation for this position is the parallelism drawn by the Constitution in the numerical correspondence of electors with the State's total of Senators and Representatives. This conformity is marked also by the requirement of varying the number of electors as the number of Representatives change.

Admittedly, the designation of all presidential electors by the ballot of all who voted throughout the State does not produce a group as representative of the people as would an election of one elector by each district alone. For instance, as the plaintiffs demonstrate, while in

1960 the popular vote in Virginia for the Republican nominee was only 52.4%, and the Democratic nominee received 47%, of the vote cast, the Republican was credited with 100% of Virginia's electoral votes and the Democrat with none. With the popular count reversed, the candidates in 1964 were favored and unfavored in electoral votes by the same formula. If plaintiffs' contention for single-elector district voting had prevailed, it would have been possible for the Democratic and Republican parties to have had proportionate representation among Virginia's electors in the same degree as they shared in the statewide tally.

Many of the Brahmins of the Constitutional Convention, such as Thomas Jefferson, James Madison and James Wilson, held the district plan more advisable. Indeed, Virginia and several of the other States for some years chose electors by district. However, it was Jefferson who advised Virginia to switch to the general ticket. His advice sprang from a desire to protect his State against the use of the general ticket by other States. He found that when chosen by districts, Virginia's representation among the electors was divided, while other States made their votes mean more in the college by adoption of the general ticket scheme of selection. This contention is no less true today.[2]

■ Thus, it cannot be safely said that the draftsmen of Article II, Section 1 believed that the electors must be chosen by congressional or other districts, as plaintiffs here contend. The clause literally leaves to the State legislature the appointment of electors "in such manner" as it may direct. Bestowal of this discretion is emphasized in McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1892). There the his-

tory of Article II is so fully traced that repetition of it may well be omitted. Nevertheless, that decision did no more than hold permissible and valid Michigan's determination to select electors by districts. Anything in the opinion appearing to rule on the acceptableness of some other plan is obiter; it is not authority for the assertion that the manner a State legislature adopts to appoint electors is beyond judicial review.

■ II. On the contrary, in our opinion the authorization of each State by Article II to "appoint, in such manner as the Legislature thereof may direct," is "subject to possible constitutional limitations". Ray v. Blair, 343 U.S. 214, 227, 72 S.Ct. 654, 96 L.Ed. 894 (1952). In short, the manner of appointment must itself be free of Constitutional infirmity.

■ It is on this premise that plaintiffs, in their second argument, ask us to declare the general ticket system invalid as "debasing, abridging or misrepresenting the weight of the votes of citizens of the United States in presidential elections unconstitutionally". Principal reliance for this argument is the "one-person, one-vote" doctrine announced in Gray v. Sanders, supra, 372 U.S. 368, 381, 83 S.Ct. 801 (1953) and reaffirmed in Wesberry v. Sanders, supra, 376 U.S. 1, 18, 84 S.Ct. 526 (1964). Clearly, these decisions do condemn any such trespass. Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

However, in our judgment the general ticket does not come within the brand of these decisions. Actually, the system is but another form of the unit rule. A familiar application is in the casting of a constituency's single vote by its several delegates in a convention. It also appears in Article II (Twelfth Amend-

2. For a comprehensive and thoughtful disquisition upon the election of electors, consult Peirce, The People's President (1968), and the Memorandum of the Sub-committee on Constitutional Amendments of the Committee on the Judiciary, United States Senate, October 10, 1961.

ment) making provision for the election of the President by the House of Representatives when no majority is obtained in the electoral college. Representatives cast the vote of their State according as the greater number of them vote.

We see nothing in the unit rule offensive to the Constitution. Concededly, its effect is exceptionable in many aspects. Some are enumerated in the Memorandum of the Subcommittee on Constitutional Amendments of the Committee on the Judiciary, United States Senate, at p. 22, supra footnote 2. Among possible objectionable results it listed disfranchisement of voters and the possibility of "minority presidents", that is one having a majority of electoral votes but not having a larger count in the popular vote than one of his opponents. Added to these detractions is the greater opportunity for the creation of "splinter" parties.

Discussing the disfranchisement defect, the Memorandum continues, p. 23, in this language:

"Above the minimum of three, additional electoral votes to which a State is entitled are based upon population. Nevertheless as much as 49 percent of a State's voters may see the portion of its electoral votes attributable to them cast for a candidate whom they oppose. It is not merely that their votes are wasted in the sense that they were cast for a loser, the unit rule not only extinguishes the voice of State minorities, but it allows State majorities to speak for them. * * *

* * * * * *

"Some defenders of the unit-rule system dispute the logic of this argument. They answer that no votes are lost when validly cast in an election; that they are actually counted toward the final decision and if, insufficient for victory, they have simply exhausted their power as votes.

"However, the effect of the unit rule is to exhaust the power of millions of individual votes at the State level before the election is actually determined at the national level. They lose their effect on the outcome at a preliminary stage in the counting. These voters are disfranchised in the sense that their votes have no bearing on the national electoral vote totals which determine the winner.

"It is sometimes said that the thousands or millions of voters in a State whose candidate was defeated in its popular election might as well not have voted at all because the State's electoral vote would have gone the same way if they had stayed at home. This is not totally realistic. If they had not voted at all, one vote would have been sufficient to deliver the State's electoral vote for the opposing candidate. By voting, the minority party voters have set a figure which must be matched and exceeded by opposing voters before the State's electoral vote bloc is awarded to the opponent."

Many other reputable authorities have inveighed against the system when applied to the selection of electors. Their strictures include excoriation of the electoral college both as an original and current institution.

Notwithstanding, it is difficult to equate the deprivations imposed by the unit rule with the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection. In the selection of electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote. Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes. This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious. No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone.

Furthermore, adoption of the general election system in Virginia is grounded on what has historically been deemed to her best interests in the workings of the electoral college. The legislature of the Commonwealth had the choice of appointing electors in a manner which will fairly reflect the popular vote but thereby weaken the potential impact of Virginia as a State in the nationwide counting of electoral ballots, or to allow the majority to rule and thereby maximize the impact of Virginia's 12 electoral votes in the electoral college tally. The latter course was taken, and we cannot say unwisely.

Reverting to the unit rule, it has never been rejected as unfair in the election of members of the United States House of Representatives when two or more or all are running at large, that is statewide. In the midst of the one-person, one-vote decisions, this practice was noticed without any question of its validity. In Wesberry v. Sanders, supra, 376 U.S. 1, 7, 84 S.Ct. 526, 530, the Court said:

"We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's. This rule is followed automatically, of course, when Representatives are chosen as a group on a statewide basis, as was a widespread practice in the first 50 years of our Nation's history." (Footnotes omitted.)

In this consideration it is notable that Congress in its amendments of the statute relating to the election of Representatives by districts, has expressly countenanced the election of them from the "State at large". 2 U.S.C. §§ 2a and 2c, supra. Presumably Congress would not have done so if it meant a breach of the one-person, one-vote principle, by then securely established. If the plan is legally permissible in the selection of Congressmen, it may hardly be stigmatized as unlawful in choosing electors.

III. Further instances of inequality in the ballot's worth between them as Virginia citizens, plaintiffs continue, and citizens of other States, exists as a result of the assignment of electors among the States. To illustrate, New York is apportioned 43 electors and the citizen there, in the general system plan, participates in the selection of 43 electors while his Virginia compatriot has a part in choosing only 12. His ballot, if creating a plurality for his preference, wins the whole number of 43 electors while the Virginian in the same circumstances could acquire only 12. Again, party-wise, it is alleged that on a national basis, the State unit system's cancellation of States' minority votes causes inequities and distortions of voting rights among citizens of the several States, by arbitrarily isolating the effects of votes cast by persons of a particular political persuasion or party in one State, from those cast by voters of the same persuasion or party in other States.

Disparities of this sort are to be found throughout the United States wherever there is a State numerical difference in electors. But plainly this unevenness is directly traceable to the Constitution's presidential electoral scheme and to the permissible unit system.

For these reasons the injustice cannot be corrected by suit, especially one in which but a single State is impleaded. Litigation of the common national problem by a joinder of all the States was evidently unacceptable to the Supreme Court. State of Delaware v. State of New York, supra, 385 U.S. 895, 87 S.Ct. 198. Readily recognizing these impediments, plaintiffs point to the district selection of electors as a solution, or at least an amelioration, of this interstate inequality of voters. However, to repeat, this method cannot be forced upon the State legislatures, for the Constitution gives them the choice, and use of the unit method of tallying is not unlawful.

Adverting to certain procedural points made by the parties, the Governor of Virginia, in view of his detachment

from the election machinery in the State, we find is neither a necessary nor a proper defendant here, and should be dropped as a party; we overrule all objections which have been reserved in the admission of evidence on the hearing of this cause.

The merits and advantages of the plaintiffs' thesis are readily recognizable. We do not discount or deride their motives, but we are of the opinion that a compulsory compliance with their demand or any other proposed limitation on the selection by the State of its presidential electors would require a Constitutional amendment. Also, we observe, that the change to a district system would not, for the reasons expressed by Jefferson, warrant Virginia or any other State to adopt an individual plan. Whatever the pattern, to succeed it must be nationwide. As was aptly stated by Professor Robert G. Dixon, "* * * any modification of the electoral college system should be on a uniform national basis in order to avoid creating additional inequities on an interstate basis." [3]

As Virginia's design for selecting presidential electors does not disserve the Constitution, we decline to place an injunction upon its effectuation. Plaintiffs' complaint will be dismissed.

## ORDER ON OPINION

Upon consideration of the pleadings, the stipulations of counsel, the exhibits and the entire record in this action, as well as the arguments thereon of counsel orally and on brief, the court for the reasons stated in its opinion filed herewith finds, adjudges and orders as follows:

1. That the Governor of Virginia be, and he is hereby, dropped as a party defendant herein;

2. That the prayers of the complaint be, and they are hereby denied, and that the complaint herein be, and it is hereby, dismissed; and

3. Remarks before the Subcommittee on Constitutional Amendments of the Senate Committee on the Judiciary, July 14, 1967, regarding proposed amendments to

3. That the defendants recover of the plaintiffs the costs of this action, and nothing further remaining to be done in the cause, it be stricken from the docket.

the Constitution relating to nomination and election of the President and Vice President.