James S. GRAHAM, Plaintiff,

v.

March FONG EU, Secretary of State, and Republican State Central Committee of California, Defendants.

Chet HOLLIFIELD et al., Plaintiffs,

v.

March FONG EU, Secretary of State, Defendant.

Nos. C–74–487 SC, S–2489 SC.

United States District Court, N. D. California.

July 28, 1975.

Judgment Affirmed Jan. 19, 1976. See 96 S.Ct. 851.

James S. Graham pro se; James F. Blumstein, Nashville, Tenn., Jon M. Van Dyke, San Francisco, Cal., James E. Sheldon, Boston, Mass., on brief.

Evelle J. Younger, Atty. Gen. of Cal., Charlton G. Holland, Deputy Atty. Gen., of Cal., for March Fong Eu.

Paul R. Haerle, San Francisco, Cal., for Republican State Central Committee of Cal.; Joseph A. Darrell, James d'A. Welch, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., on brief.

William A. Jennings, San Jose, Cal., Marilyn J. Blawie, James L. Blawie, Fremont, Cal., for Chet Hollifield.

Before BROWNING, Circuit Judge, and EAST and CONTI, District Judges.[*]

CONTI, District Judge:

These cases raise a constitutional question of first impression, specifically, to what extent, if any, are the respective plaintiffs entitled to representation at the Republican and Democratic national conventions. Plaintiff in No. C–74–487 SC is a registered Republican voter in California. He instituted suit on his own behalf against the Republican State Central Committee of California and the Secretary of State of California. The plaintiffs in No. S–2489 SC are registered Democratic voters in California. On their own behalf and for all who are similarly situated [1] they have sued the Secretary of State of California.

Both cases originated as challenges to a statewide-at-large system of electing delegates from California to the Republican and Democratic party conventions.[2] The Democratic plaintiffs were first to dispute the validity of the scheme by bringing the second entitled lawsuit on June 23, 1972, in the District Court for the Eastern District of California. That court denied plaintiffs' request for the convening of a three-judge court and dismissed the complaint. Plaintiffs' appeal resulted in an order of reversal and remand necessitating the convening of a three-judge court. In the meantime, the Republican plaintiff filed his case in this District Court for the Northern District of California and also requested the convening of a three-judge court. His request was granted. Furthermore, by order of the Chief Judge of this Circuit this court was specially assigned to the Eastern District of California in order that these two cases could be heard on a consolidated basis. Accordingly, a hearing on the merits of both cases was held on February 26, 1975.[3]

---

[*] Honorable James R. Browning, United States Circuit Judge for the Ninth Circuit, William G. East, Senior United States District Judge for the District of Oregon, and Samuel Conti, United States District Judge for the Northern District of California, constituting a statutory three-judge District Court by designation of Chief Judge Richard H. Chambers for the Ninth Circuit, dated April 8, 1974.

1. We have not certified or rejected No. S–2489 as a class action. As will become evident, this will not be necessary.

2. As discussed more fully below, a winner-take-all method is mandated by California Election Code § 6201 (West 1961) for the election of California's delegation to the Republican National Convention and was mandated by former California law, e. g., Chap. 1821, § 2, [1971] Calif.Stats. at 3965 (repealed 1974), for the election of California's delegation to past Democratic National Conventions.

3. At the time of the February 26 hearing a motion for summary judgment on behalf of the Republican plaintiff was pending. In support of this motion the Republican plaintiff submitted his own declaration and the declarations of Daniel A. Mazmanian, a political scientist, and Representative Paul N. McCloskey, Jr., an unsuccessful candidate for the Republican presidential nomination in 1972. In opposition to the motion the defendant Republican State Central Committee submitted an affidavit by Putnam Livermore, a former Republican party official.

The parties were informed, without objection from any of them, that the February 26 hearing would serve both as a hearing on the Republican plaintiff's motion for summary judgment and as a trial on the merits of both cases. All parties were afforded an opportunity to introduce testimony in support of their positions, but submitted the cases on the declarations and affidavits previously filed plus a statement of the vote for the California presidential primaries from 1912 to 1972, inclusive, introduced by defendant Secretary of State.

The contested manner of electing delegates to the Republican National Convention is set forth chiefly at California Elections Code §§ 6000–6262 and §§ 10260–10265. Provisions of the Elections Code pertinent to this case are reproduced in the margin.[4] The focus of Graham's challenge is the fact that under present state law Republican voters cannot cast votes for individual candi-

4. **§ 6020. Notice to secretary of state**

The chairmen of the state central committee of each of the political parties qualified to participate in the presidential primary shall notify the Secretary of State on or before the first day of March immediately preceding the presidential primary as to the number of delegates to represent the State in the next national convention of his party.

**§ 6050. Joinder of three or more voters as committee in proposing nomination of candidates for delegates**

Any three or more voters of the State who are registered as intending to affiliate with the same political party may join as a committee in proposing the nomination of a group of candidates for delegates. The committee may elect its officers, select the candidates for delegates, select the chairman of the committee, arrange for the appointment of verification deputies, secure the endorsement of the person, if any, preferred by the committee as candidate for presidential nominee, appoint alternates, assemble and file all necessary papers, and take all other action which may be necessary for the organization and election of the group. The committee in performing its functions may act through its officers or designated representatives.

**§ 6055. Endorsement of group by candidate for presidential nominee**

Each group of candidates for delegates, which intends to pledge itself to the candidacy of a particular candidate for presidential nominee shall have the endorsement of the candidate for presidential nominee for whom the members of the group have filed a preference. The endorsement of the candidate for presidential nominee shall be filed with the Secretary of State before the circulation of any nomination papers of a group of candidates pledged to the support of his candidacy as a presidential nominee.

**§ 6081. Nomination papers**

. . . upon the filing of nomination papers pursuant to this chapter, the persons named in such papers shall be voted upon as delegates to the respective national conventions of the several political parties, but their name shall not be printed upon the ballots of their respective parties.

**§ 10261. Arrangement of ballot in parallel columns**

The names of the candidates for delegates of any political party shall not appear upon the ballot. In lieu thereof the names of the persons preferred for President by each group of candidates, or the name of the chairman of each group that has designated no preference, shall be arranged upon the ballot of the party in a column . . . ..

**§ 6260. Ballot; space for write-in**

Notwithstanding any other provisions of law, a space shall be provided on the presidential primary ballot for an elector to write in the name of a candidate for President of the United States.

**§ 6201. Certification of election**

Immediately after he has compiled the returns of the votes for delegates, the Secretary of State shall issue a certificate of election, as to each [political] party, to each person who is a member of the group which received the largest vote cast for any group of that party, such person thereby being elected as delegate to his national party convention.

**§ 6262. Delegates to national convention**

Any person who receives, by write-in vote, a plurality of the votes cast for President of the United States shall, within 10 days after the primary election, file a list of delegates to the national convention of his political party with the Secretary of State in the manner prescribed in Sections 6053 and 6054.

Although the names of the candidates for delegates do not appear on the ballot, their names are published in newspapers, Calif. Elec.Code § 6172 (West Supp.1975), and are posted in the county clerks' offices, Calif. Elec.Code § 10010 (West Supp.1975). Prior to 1941 the names of the candidates for delegates did appear on the ballot and a political party member could vote for any number of delegates up to the number of delegates in the party's call regardless of an individual delegate's preference as to a presidential nominee. Chap. 137, § 7 [1915] Calif.Stats. at 284 (repealed 1941). At that time, however, a space was also provided so that a party member could vote for an entire slate of delegates pledged to one presidential candidate by making one mark on the ballot. *Id.* And an examination of the statements of the vote from 1912 through 1940 indicates

dates for the position of delegate to the Republican Party's convention.[5] Instead, a Republican must vote for a bloc of delegates who are committed to the candidacy of a presidential aspirant.[6] And even then a voter does not cast a ballot for the members of one slate of delegates as opposed to the members of another, since the names of individual candidates who comprise the various slates are not listed on the ballot.[7] Only the names of the presidential aspirants[8] appear on the ballot. And whichever aspirant collects the highest number of votes is entitled to have that entire slate of delegates supporting his or her candidacy certified exclusively to represent California at the Republican National Convention. In this sense, therefore, the entire California delegation to the convention is a reward to the victorious Republican candidate and the primary —to borrow the vernacular expression —is winner-take-all.[9]

The procedure established by California for electing delegates to the Democratic National Convention, although once the same as for Republicans, is now markedly different.[10] Fearing a return to a statewide-at-large election of delegates to the Democratic National Convention,[11] the Democractic plaintiffs have joined in the Republican plaintiff's attack on the constitutional validity of a winner-take-all system.[12] Moreover, they seek a declaration of unconstitutionality as to the recently promulgated, but as yet unused, Alquist Open Presidential Primary Act.[13] This act permits voting for individual delegates rather than for slates and promotes selecting convention delegates from Congressional districts rather than on a statewide basis. Under the Alquist Act once the number of delegates in the Democratic Party's call for California is ascertained, 75% of the delegates in the call will be assigned to each of California's forty-three Congressional districts in accordance with an apportionment formula which reflects the strength of the Democratic Party in that district.[14] Steering

---

that this straight ticket means of voting was followed by the overwhelming number of voters.

5. See Calif.Elec.Code § 10317 (West Supp. 1975).

6. The number of candidates for delegate status on each slate is the same as the number of delegates allotted to California by the Republican National Party, Calif.Elec.Code § 6052 (West 1961) ; slates uncommitted to a particular presidential aspirant are permissible, Calif.Elec.Code § 6001 (West 1961).

7. Calif.Elec.Code §§ 6081 (West Supp.1975), 10261 (West 1961).

8. When a slate of delegates is not pledged to a particular presidential nominee the name of the chairperson of the delegation is listed on the ballot. Calif.Elec.Code § 10261 (West 1961).

9. California is not alone in resorting to a unit rule for election of delegates to the Republican National Convention. The laws of Oregon, Ore.Rev.Stat. § 249.221(2) (1971), Rhode Island, R.I.Gen.Laws § 17–12.1–11 (Supp.1974), and the District of Columbia, D.C.Code Ann. § 1–1105(b)(3)–(5) (Supp. 1974–5), all provide for winner-take-all presidential primaries. However, due to the size of its population and a very real poten-

tial for political diversity, the effect of a winner-take-all rule is unquestionably most dramatic in California.

10. The former practice of electing delegates to the Democratic National Convention on a winner-take-all basis has been replaced by the procedures set forth in the Alquist Open Presidential Primary Act, Calif.Elec.Code §§ 6300–6390 (West Supp.1975).

11. The Democratic plaintiffs suggest that the Alquist Open Presidential Primary Act contravenes the state constitution. Brief for Democratic plaintiffs, at 28–29. We intimate herein no views on that matter. The author of the act has, however, introduced new legislation, Calif.S.B.No.288 (1975), which would repeal the act.

12. Brief for Democratic plaintiffs, at 20–22.

13. Calif.Elec.Code §§ 6300–6390 (West Supp.1975). The act is limited to the election of California's delegates to the Democratic National Convention.

14. The formula is set forth at Calif.Elec.Code § 6304 (West Supp.1975) :
   "The number of delegates which each congressional district may elect shall be based on a formula which apportions 75 per cent of the total delegation allocated to the state by the Democratic National Commit-

committees, whether committed to no-one in particular or to a specific presidential aspirant, will prepare forty-three slates of candidates for the delegate positions assigned to each district.[15] And every slate of delegates will be entirely pledged to the nomination of a particular presidential candidate or be totally uncommitted.[16] The ballots will list the names of all candidates running for a delegate position from an individual district, as well as their presidential preferences, and a voter will be confronted with the following instructions:

"You are not required to cast all of your votes for candidates pledged to the same presidential candidate. You may distribute your votes among individual candidates for delegates pledged to different presidential candidates or you may cast all your votes for candidates pledged to the same presidential candidate.

"Vote for [number [17]] delegates." [18] After the election results have been recorded, the elected delegates will meet to choose the remaining 25% of the party call for California.[19] This will be accomplished by holding separate caucuses of the elected delegates who are pledged to the various candidates or who are members of an uncommitted delegation.[20] Each caucus will be entitled to select the same percentage of the remaining 25% of the California Democratic Party's call as the number of delegates comprising the caucus is of the total number of elected delegates.[21]

Each of these delegate election schemes, plaintiffs allege, create invidious discriminations against those who cast ballots for losers and accordingly violate rights guaranteed the losing voters by the First and Fourteenth Amendments. The Republican plaintiff argues that electing California's delegates to his party's national convention from each Congressional district—a system incorporated in the new scheme for Democrats—would comport with federal constitutional requirements. On the other hand, we understand the Democratic plaintiffs to argue that nothing short of a statewide election of delegates on a proportional basis [22] is permissible.

Plaintiffs contend that failure to provide convention representation for those who support losing candidates is an unconstitutional denial of "fair and effective representation" and the "right to cast an effective ballot." [23] The argument is that the Equal Protection Clause

---

tee (rounded to the nearest whole integer) among the congressional districts in a manner which gives equal weight to the average of the vote in each district for Democratic candidates in the two immediately preceding presidential elections and to the Democratic Party registration in each district on January 1 of the presidential primary year."

15. Calif.Elec.Code §§ 6375, 6376 (West Supp.1975).

16. Calif.Elec.Code § 6378 (West Supp.1975).

17. The number of votes each voter is entitled to cast is equal to the number of delegates to be elected from that person's district. Calif.Elec.Code § 10282 (West Supp.1975).

18. Calif.Elec.Code § 10283 (West Supp. 1975).

19. Calif.Elec.Code § 6380.5 (West Supp. 1975).

20. *Id.*

21. *Id.*

22. Brief for Democratic plaintiffs, at 5.

23. It is easy to understand the Republican plaintiff's objection to the winner-take-all primary. When voters must choose among three or more presidential candidates (and, consequently, three or more slates of delegates), the possibility exists that the majority of voters will go unrepresented, while a minority enjoys overrepresentation at the convention. For example, this became a reality in the 1972 Democratic presidential primary in California, the last Democratic primary conducted under the winner-take-all rule. Senator McGovern received 1,550,652 votes or 43.5% of the total popular vote. But because he received the highest number of votes among the presidential candidates, according to state law the slate of delegates committed to his candidacy represented California exclusively at the convention, and the 2,013,866 California Democrats casting votes for other candidates were completely unrepresented at the convention. The reason for the Democratic plaintiffs' dissatisfaction with the Alquist Open Presidential Primary

prohibits the state from denying losers balanced representation in the forum in which a presidential nominee is finally chosen. This interpretation of the Equal Protection Clause was rejected by the Supreme Court in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).[24]

*Whitcomb* involved a challenge to a state statute establishing Marion County, Indiana, as a multi-member district for the election of state legislators. A central thesis of the plaintiffs' case was the same as that presented here: that is, that the winner-take-all aspect of a multi-member district disenfranchises those who support losers, since they have no representative of their own, and at the same time overrepresents those who support winners, since they receive all of the legislative seats with less than all of the popular vote. The Court ex-

plained that these results are simply consequences of losing elections. Briefly put, it is not "a denial of equal protection to deny legislative seats to losing candidates." 403 U.S. at 153, 91 S.Ct. at 1874. The Court rejected the contention "that any group with distinctive interests must be represented in [the final decision-making forum] if it is numerous enough to command at least one seat." 403 U.S. at 156, 91 S.Ct. at 1875.

The Court warned that multi-member districts may run afoul of the Equal Protection Clause if in fact they " 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' " 403 U.S. at 143, 91 S.Ct. at 1869, *quoting Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), and *Burns v. Richardson*, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). The Court

---

Act is not as readily apparent. We infer from their argument that under the new act a minority of voters may go unrepresented or underrepresented at the national convention. *See* Brief for Democratic Plaintiffs, at 19. A complete lack of proper representation will occur, according to plaintiffs' argument, whenever none of the delegate candidates supporting a particular presidential aspirant are able to win a delegate position in any of California's 43 districts, but the statewide total of all votes cast for some delegate supporting that aspirant are proportionally sufficient to merit one or more places in the whole California delegation. Similarly, underrepresentation will occur whenever a presidential aspirant has managed to get at least one of the delegates supporting his or her candidacy elected but would be entitled to more places in the delegation if the votes were counted on a statewide basis.

24. The Republican plaintiff places great reliance on *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), invalidating a Georgia primary election system for various statewide officers. Under the Georgia scheme, each voter was given one vote. In counting the votes, a "county unit system" was employed, under which the popular vote was tallied on a county-by-county basis, the winners in the county elections were awarded the counties' unit votes, and the candidate with the most unit votes was declared winner of the primary. The Court held this scheme invalid because it weighted "the ru-

ral vote more heavily than the urban vote and weight[ed] some small rural counties heavier than other larger rural counties." 372 U.S. at 379, 83 S.Ct. at 808. During the course of litigation in *Gray*, Georgia amended its county unit system to allocate unit votes to the counties in proportion to their population. The Court held this did not cure the defect, stating:

"The county unit system, even in its amended form . . . would allow the candidate winning the popular vote in the county to have the entire unit vote of that county. Hence the weighting of votes would continue, even if unit votes were allocated strictly in proportion to population. Thus if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded."

372 U.S. at 381 n. 12, 83 S.Ct. at 809.

The Republican plaintiff argues that under *Gray* it is impermissible to discard or "wash out" losing votes at a stage prior to actual nomination. *Gray* lays down no such rule. As explained in *Gordon v. Lance*, 403 U.S. 1, 5, 91 S.Ct. 1889, 1891, 29 L.Ed.2d 273 (1971), the defect considered in *Gray* was solely that of "geographic discrimination," that is, "Votes for the losing candidates were discarded solely because of the county where the votes were cast." The Republican plaintiff makes no claim of geographic discrimination.

pointed out, however, that it does not suffice to show that an identifiable group has perennially failed to elect representatives in proportion to its voting strength. 403 U.S. at 149, 91 S.Ct. 1858. It must be factually demonstrated that the group allegedly discriminated against "had less opportunity than did other[s] . . . to participate in the political processes and to elect [delegates] of their choice." *Id.* Neither set of plaintiffs has made such a showing with respect to the California system of selecting delegates for the two major parties.[25]

■ The Republican plaintiff argues that the essential vice of the Republican primary is its statewide character. With respect to a state as large and populous as California, "fair and effective representation," he contends, requires that delegates to the national convention be selected in district elections so that minority interests within the California population may have a better chance to elect some delegates of their choice. The size of a district is not in itself a sufficient reason to impose judicial redistricting, even if the "district" is coextensive with state boundaries. The Court has noted that a case of vote dilution with respect to an identifiable group might be easier to prove "when the [multi-member] district is large and elects a substantial proportion of the seats in either house of a bicameral legislature." *Whitcomb v. Chavis, supra,* 403 U.S. at 143, 91 S.Ct. at 1869. But whether or not the size factor is present, "proof of lessening or cancellation of voting strength must be offered." *Chapman v. Meier,* 420 U.S. 1, 17, 95 S. Ct. 751, 761, 42 L.Ed.2d 766 (1975).[26]

■ Finally, the Republican plaintiff suggests that *Whitcomb* should be distinguished on the ground that in *Whitcomb* the plaintiffs had been given an equal opportunity to participate in the direct primary election at which legislative candidates were finally chosen, while in this case the winner-take-all rule is applied at a preliminary stage of the nomination process. *See Whitcomb v. Chavis, supra,* 403 U.S. at 149, 91 S. Ct. 1858. The Constitution does not require that voters be afforded an opportunity to participate at either final or preliminary stages in the nomination process for presidential candidates. Whether the voters will participate in the delegate selection process, and, if so, at what stage, and whether their participation will be translated directly into delegate representation at the national conventions are matters for the political parties themselves to determine,[27] and,

---

25. Although the Republican party has employed a statewide winner-take-all system for over 30 years, the Republican plaintiff has failed to demonstrate factually that any identifiable group has been denied, because of racial or political differences, an opportunity to participate in the Republican primary and to elect delegates of its choice.

With respect to the Democratic plaintiffs, such a showing would be impossible at this time because the delegate selection system prescribed by the Alquist Act has not yet been applied in a primary election.

26. The size factor to which the Court has referred concerns the legislative strength of a multi-member district in relation to the total number of legislative seats in either house of a bicameral state legislature. At the 1972 Republican Convention, the California delegation comprised only 7% of the total number of delegates.

27. At least with respect to California's Republican primary, it could be argued that *Whitcomb* is distinguishable because the delegates elected in that primary are committed to support only the winner of the primary, and it is therefore certain that losing candidates will not be represented at the national convention. The argument is that vote dilution is inherent in the California primary, absent a requirement of proportional representation because the delegates are not required to represent the interests of the entire constituency, as are representatives in legislative bodies. *See Dallas County, Alabama v. Reese,* 421 U.S. 477, 481, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975). Definition of the role of the convention delegate is initially a matter for the political party, not the courts. *Cf. Cousins v. Wigoda,* 419 U.S. 477, 489–90, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). A political party may rationally de-

if the parties permit it, for the states.[28] *Cf. Fortson v. Morris,* 385 U.S. 231, 233, 234, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966). Assuming the Equal Protection Clause to be applicable here, it requires only that when an election is held in the delegate selection process, the weight assigned to individual votes cannot depend on where individual voters live or whether they belong to identifiable racial or political groups. *See Developments in the Law, Elections,* 88 Harv.L. Rev. 1111, 1118–19 (1975). There are no claims of geographic discrimination in these cases,[29] and neither set of plaintiffs has made a factual showing of discrimination against an identifiable racial or political group. All that appears is that losing voters are denied convention representation, not because of their support of particular candidates, but because the candidates they have chosen to support have lost an election. This is not a denial of equal protection.[30]

The Republican plaintiff briefly suggests that the winner-take-all Republican primary is an unacceptable infringement on "the right of individuals to associate for the advancement of political beliefs," because the supporters of losing candidates are denied the opportunity to be heard at the national convention, through their own delegate representation. "The right to have one's voice heard and one's views considered by the appropriate governmental authority is at the core of the right of political association." *Williams v. Rhodes,* 393 U.S. 23, 41, 89 S.Ct. 5, 16, 21 L.Ed.2d 24 (1968) (Harlan, J., concurring). But the right to bring one's views to the attention of a final decision-making forum does not include a right to official representation within the forum itself. If the right of association included a right of proportional representation, *Whitcomb v. Chavis* could not have been decided as it was. *Cf. Cousins v. Wigoda,*

---

cide either that the convention should be as representative and deliberative as possible, or, on the other hand, that intra-party disputes should be resolved largely within the delegate selection process itself, the convention serving principally as a vote-registering device to confirm choices already made. The Equal Protection Clause requires only that once the delegates' role is determined, any opportunity the voters may be given to participate in the delegate selection process cannot be denied or diminished on account of geographic, racial, or political differences.

*See also Whitcomb v. Chavis,* where the Court stated (403 U.S. at 155, 91 S.Ct. at 1875):

"Moreover, even assuming bloc voting by the delegation contrary to the wishes of the ghetto majority, it would not follow that the Fourteenth Amendment had been violated unless it is invidiously discriminatory for a county to elect its delegation by majority vote based on party or candidate platforms and so to some extent predetermine legislative votes on particular issues. Such tendencies are inherent in government by elected representatives; and surely elections in single-member districts visit precisely the same consequences on the supporters of losing candidates whose views are rejected at the polls."

28. We have been presented with no claim of conflict between party rules and state law

with respect to California's method of selecting national convention delegates. *See Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). We note, however, that the California State Democratic Central Committee has resolved to request a ruling from the Democratic National Committee regarding the validity, under party rules, of the selection procedures prescribed by the Alquist Act.

29. *Compare Bode v. National Democratic Party,* 146 U.S.App.D.C. 373, 452 F.2d 1302 (1971); *Georgia v. National Democratic Party,* 145 U.S.App.D.C. 102, 447 F.2d 1271 (1971); *Doty v. Montana State Democratic Cent. Comm.,* 333 F.Supp. 49 (D.Mont. 1971); *Maxey v. Washington State Democratic Comm.,* 319 F.Supp. 673 (W.D.Wash. 1970).

30. Because of this conclusion we need not decide whether the California presidential primaries are justified by "compelling" state or party interests, and it cannot be said that the means chosen to select California delegates to the two major conventions are irrational in terms of the interest in selecting the best possible candidate and building a winning consensus in support of him. *See* A. Bickel, *Reform and Continuity* 57 (1971); *cf. Storer v. Brown,* 415 U.S. 724, 729–36, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

419 U.S. 477, 488 n. 8, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).

■ For these reasons, and on the records developed in these cases, we conclude that the California methods of electing delegates to the two major national conventions do not violate the First or Fourteenth Amendment rights of those who vote for losing candidates.

■ With respect to the Republican primary, we wish to add that we find support for our conclusion in the analogy between this statewide primary and the universal practice of electing presidential electors on a statewide winner-take-all basis. In *Williams v. Virginia State Board of Elections*, 288 F.Supp. 622 (E.D.Va.1968), *aff'd mem.*, 393 U.S. 320, 89 S.Ct. 555, 21 L.Ed.2d 516 (1969), use of the winner-take-all election was upheld in the electoral college context against the very arguments that the Republican plaintiff makes against the California winner-take-all primary.[31] The plaintiffs in *Williams v. Virginia State Board of Elections* sought to have the winner-take-all method of choosing electors declared invalid and to require Virginia to provide for the election of presidential electors from districts within the state. They argued that the winner-take-all system debased, abridged, and misrepresented the weight of votes cast by persons within Virginia by over-valuing the votes of those who voted for the plurality winner and discarding the votes cast for losers. The court recognized that the unit rule might produce objectionable results, including election of a President who had not received a plurality of the popular vote in the nation as a whole, but it read the one person-one vote cases to require only that each citizen's vote be of equal weight in the election itself:

"In the selection of electors the [winner-take-all] rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote. Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes. This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious. No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone."

288 F.Supp. at 627.[32]

In short, the Constitution does not require that when a state provides that its citizens shall vote for presidential electors the votes for losing candidates must be made more "effective" by affording, through districting, a greater opportuni-

---

31. The winner-take-all method of choosing presidential electors was also challenged in an original action brought by 13 states against the other 37 and the District of Columbia. The 13 states sought to require that electors be chosen from districts, and, as an interim measure, to require that the electoral votes be cast in proportion to the popular vote each candidate received in the state. *See* R. Dixon, *Democratic Representation* 565–69 (1968). The Supreme Court refused to entertain the suit. *Delaware v. New York*, 385 U.S. 895, 87 S.Ct. 198, 17 L.Ed.2d 129 (1966).

In *Penton v. Humphrey*, 264 F.Supp. 250 (S.D.Miss.1967) (3-judge court), the court dismissed, for failure to state a claim, a complaint challenging the winner-take-all method. Relying on *Delaware v. New York*, the court rejected the plaintiffs' argument that each state's electoral votes must be divided according to the popular vote that each candidate received.

32. The district court was also unimpressed with the argument "that on a national basis, the State unit system's cancellation of States' minority votes causes inequities and distortions of voting rights among citizens of the several States, by arbitrarily isolating the effects of votes cast by persons of a particular political persuasion or party in one State, from those cast by voters of the same persuasion or party in other States." 288 F.Supp. at 628. It viewed these interstate distortions as an inevitable consequence of the constitutional decision to fragment the election process among the several states. 288 F.Supp. at 628–29.

ty for those votes to be translated into voting strength in the electoral college itself.[33]

The Republican plaintiff seeks to distinguish the holding in *Williams v. Virginia State Board of Elections* on a number of grounds. First, he argues that while Article II, Section 1, expressly grants the states broad power in deciding how to appoint electors, it does not grant the states any authority with respect to the nomination of presidential candidates. It is true that "[t]he States themselves have no constitutionally *mandated* role in the great task of the selection of Presidential and Vice-Presiden-

tial candidates", *Cousins v. Wigoda, supra,* 419 U.S. at 489–90, 95 S.Ct. at 549 (emphasis added), but this does not mean that the states are prohibited from legislating in the area, at least insofar as the legislation is not inconsistent with party policy. For the moment, at least, California *does* have a role in deciding how California voters will participate in the selection of the Republican nominee for President. Plaintiff does not contend otherwise. In furtherance of its power, however derived, California has passed a statute providing for a winner-take-all election, just as it has provided for the selection of presidential electors on a statewide basis.[34]

33. In *Williams v. Rhodes, supra,* the Supreme Court held that the rights of supporters of George Wallace to associate to advance their political beliefs and to cast effective votes in the general election were infringed by statutory provisions that made it virtually impossible for them to get their candidate's name on the Ohio presidential ballot. But the right to cast an "effective" vote announced in *Williams v. Rhodes* insured only that supporters of a particular candidate for President would have a reasonable opportunity to offer their candidate to the electorate and to vote for him themselves. The Court did not suggest that votes for a candidate who was placed before the electorate but lost would be considered ineffective unless Ohio's electors were apportioned among the candidates to reflect their popular support, or were selected from single-elector districts. In other words, it was not necessary that voter support be translated into voting strength in the electoral college, the final decision-making forum. The Court's affirmance in *Williams v. Virginia State Board of Elections* just a few months later confirms the limited reach of the "effective ballot" rationale of *Williams v. Rhodes,* one of the principal cases relied upon by the Republican plaintiff.

If the rationale of the two *Williams* cases, both of which dealt with the electoral college, is applied to the California primary, it is clear that the Constitution would require only that a candidate who has demonstrated at least some following among the electorate must be permitted to appear on the ballot so his supporters will have an effective choice among potential nominees and be assured that if the candidate appeals to enough voters he will capture all of California's delegates. The holding of the second *Williams* case would foreclose any argument that votes cast for a losing candidate must never-

theless be given some weight at the convention.

34. In the early years of the Republic, the states chose electors in a variety of ways. In some states, the electors were chosen by the state legislature, in some they were chosen by the people in a statewide winner-take-all election, and in others they were elected from separate districts within the state. Variants of each of these methods were also employed. *See generally McPherson v. Blacker,* 146 U.S. 1, 29–33, 13 S.Ct. 3, 36 L.Ed. 869 (1892). Virginia switched from district elections to the at-large general ticket method in 1800 on the advice of Thomas Jefferson. *Id.* at 31, 13 S.Ct. 3.

"His advice sprang from a desire to protect his State against the use of the general ticket by other States. He found that when chosen by districts, Virginia's representation among the electors was divided, while other States made their votes mean more in the college by adoption of the general ticket scheme of selection. This contention is no less true today."

*Williams v. Virginia State Board of Elections, supra,* 288 F.Supp. at 626. After 1832, electors were chosen in winner-take-all elections in all of the states except South Carolina, where the legislature chose them through 1860. *McPherson v. Blacker, supra* 146 U.S. at 32–33, 13 S.Ct. 3. Colorado's electors were chosen by the legislature in 1876, and Michigan used the district method of election in 1892. Since then, however, the winner-take-all election has been used in all of the states. W. Goodman, *The Two-Party System in the United States* 158–59 (3d ed. 1964).

The wide range of means employed in selecting convention delegates today is comparable to that which prevailed in the selection of presidential electors in the early days of

It is difficult to see how the source of the state's power to provide election machinery has any bearing on whether the state has exercised that power in a way that satisfies the Fourteenth Amendment. In *Williams v. Virginia State Board of Elections, supra*, 288 F.Supp. at 626, the court recognized that the power expressly granted to Virginia under Article II, Section 1, was nevertheless limited by the Fourteenth Amendment. Had the court determined that the winner-take-all method conflicted with the Fourteenth Amendment, nothing in Article II, Section 1, would have prevented the court from imposing the districting remedy. After considering allegations of vote dilution and cancellation that are indistinguishable from those presented in this case, the court specifically held that the winner-take-all election was consistent with the Equal Protection Clause. Nowhere did the court suggest that the express grant of authority under Article II, Section 1, somehow relaxed the otherwise applicable standard of review under the Fourteenth Amendment. *See Williams v. Rhodes, supra*, 393 U.S. at 29, 89 S.Ct. 5.

The Republican plaintiff points to the fact that selection of presidential electors is next to the final stage of the process of selecting a President. By way of contrast, the Republican plaintiff argues:

"The selection of delegates within each state constitutes only a preliminary part of the multifaceted processes leading to the selection of a president. At this level full recognition of voter sentiment is imperative. If nominating procedures are structured so as to allow minorities to control the intermediate stages of the nominating processes, there is substantial risk of having the presidential nominee reflect the will of only a narrow political faction."

The force of the electoral college analogy does not derive merely from the fact that the selection of convention delegates is part of the overall presidential election process, although this relationship may justify reliance on the electoral college analogy in the first instance. *See Bode v. National Democratic Party*, 146 U.S.App.D.C. 373, 452 F.2d 1302, 1307–09 (1971). *Compare Gray v. Sanders*, 372 U.S. 368, 378, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The electoral college system is pertinent because it operates to select a single winner from a field of candidates, just as the nominating process does. The choice of delegates to a national convention from which a single nominee must emerge occurs at the same stage in the nominating process as does the election of electors, who must, finally, choose a single President. For each system to operate, there must be exclusion of losing candidates at some point. If the Constitution does not require that electors be chosen from districts in order to make it more likely that votes for losing presidential candidates will be registered in the electoral college (the final decision-making forum), it is not apparent why convention delegates must be chosen from districts in order to insure that all candidates for the nomination will have a greater opportunity for representation at the convention that finally selects a nominee. In each case, the selection of representatives to cast the ultimate vote is itself part of the narrowing process.

Finally, the Republican plaintiff points out that the electoral college members vote only once, in their respective state capitols, and if no winner emerges, the choice is left to the House of Representatives. In contrast, plaintiff argues, the convention is a deliberative body and therefore representatives of all candidates should be present. As noted *supra*, note 27, the extent to which

---

the Republic. In some states, delegates are elected in a winner-take-all election, in some they are appointed by state party committees, and in some they are selected in the course of caucuses or conventions at both the state and local levels. *See generally Nomination & Election of the President and Vice President of the United States*, Pamphlet prepared for the Office of the Secretary of the Senate 72–173 (1972).

a convention is deliberative depends largely on how the party and the states choose to structure the nominating process. Recent history demonstrates that the convention is usually no more deliberative than the electoral college. Frequently, one candidate emerges from the state primaries, conventions, and caucuses with so many committed delegates that his nomination is as assured as is the election of a particular presidential candidate after the general election but before the electors convene. In each case, the final decision-making forum is little more than a vote-registering mechanism. Only a single vote of the representatives is necessary to confirm a choice already made in the states.[35]

This opinion shall constitute the court's findings of fact and conclusions of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure. The defendants shall prepare for the court, and serve upon plaintiffs, proposed forms of judgments in conformity with this opinion. The proposed judgments shall be lodged with the court and served upon plaintiffs within five (5) days following the filing of this opinion.

---

35. Voting for the Republican nominee has not gone beyond the first ballot since 1948. More than one ballot has been required at the Democratic convention only once (in 1952) since 1936, when the Democratic Party dropped the rule requiring that a nominee receive the votes of two thirds of the delegates. *See* R. Bain & J. Parris, *Convention Decisions & Voting Records*, Appendix C (1973).