# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-50214

United States Court of Appeals
Fifth Circuit

**FILED**
February 26, 2020

Lyle W. Cayce
Clerk

LEAGUE OF UNITED LATIN AMERICAN CITIZENS;
LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF TEXAS;
JOSEPH C. PARKER, JR.; HECTOR FLORES; SANFORD LEVINSON;
YVONNE M. DAVIS; MARY RAMOS; GLORIA RAY;
GUADALUPE TORRES; RAY VELARDE; DORIS WILLIAMS,

Plaintiffs–Appellants,

versus

GREG ABBOTT, Governor of the State of Texas;
DAVID WHITLEY,
in his official capacity as Secretary of State of the State of Texas,

Defendants–Appellees.

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, SMITH, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The plaintiffs—several organizations and eligible voters—challenge the constitutionality of Texas's winner-take-all ("WTA") method for selecting presidential electors. They contend that WTA violates the one-person, one-vote principle rooted in the Equal Protection Clause of the Fourteenth Amendment and freedom of association under the First and Fourteenth Amendments. The

No. 19-50214

defendants—Texas's Governor and Secretary of State—moved to dismiss, which the district court granted.  We affirm.

## I.

The Constitution authorizes each state legislature to appoint electors "in such Manner as the Legislature thereof may direct."[1]  Individual citizens therefore have "no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college."  *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam).  Nevertheless, "whenever the State has adopted an electoral process for determining who will represent any segment of the State's population," "the Equal Protection Clause confers the substantive right to participate on an equal basis with other qualified voters."  *Lubin v. Panish*, 415 U.S. 709, 713 (1974).

In states that employ a WTA system for selecting presidential electors, the political party whose candidate receives the most votes statewide gets all the electors.  That system has a long history.  In fact, during the first presidential election, Pennsylvania selected its electors using WTA.  *McPherson v. Blacker*, 146 U.S. 1, 29 (1892).  After losing the 1796 presidential election—in part because two states he relied on for support, Virginia and North Carolina, split their electoral votes among multiple candidates—Thomas Jefferson convinced Virginia to adopt WTA.  *Id.* at 31.  Other states quickly followed suit; by 1832, all states except South Carolina chose their presidential electors

---

[1] U.S. CONST. art. II, § 1, cl. 2; *see also McPherson v. Blacker*, 146 U.S. 1, 35 (1892) ("[I]t is seen that from the formation of the government until now the practical construction of the clause has conceded plenary power to the state legislatures in the matter of the appointment of electors.").

2

No. 19-50214

WTA. *Id.* at 32. Consistent with that history, Texas has selected its electors based on a statewide WTA vote since it joined the Union.[2] Today, Texas—along with forty-seven other states and the District of Columbia—continues to select all presidential electors on a WTA basis.[3]

The plaintiffs complained that Texas's WTA system violates (1) the one-person, one-vote principle rooted in the Equal Protection Clause of the Fourteenth Amendment, (2) the First and Fourteenth Amendment right to associate, and (3) section 2 of the Voting Rights Act.[4] Plaintiffs sought various forms of injunctive relief designed to replace WTA with a system of proportional apportionment based on each party's percentage of the statewide vote.[5] The defendants moved to dismiss for failure to state a claim. The district court granted that motion and dismissed all claims with prejudice.

---

[2] *See* Act approved March 15, 1848, 2d Leg., ch. 94, § 2, *reprinted in* 3 H.P.N. Gammel, *The Laws of Texas, 1822–1897*, at 104 (Austin, Gammel Book Co. 1898).

[3] *See* TEX. ELEC. CODE ANN. § 192.005 (West) ("The set of elector candidates that is elected is the one that corresponds to the candidates for president and vice-president receiving the most votes."); *Conant v. Brown*, 248 F. Supp. 3d 1014, 1024 (D. Or. 2017). The two outlying states—Maine and Nebraska—also have a WTA component. Both select electors by congressional district and award the remaining two electors to the candidate who earns a plurality of the statewide vote. *Conant*, 248 F. Supp. 3d at 1024.

[4] Similar groups of lawyers filed the same claims in the Central District of California, the District of Massachusetts, and the District of South Carolina. *See Baten v. McMaster*, 374 F. Supp. 3d 563 (D.S.C. 2019), *appeal filed*, No. 19-1297 (4th Cir. March 21, 2019); *Lyman v. Baker*, 352 F. Supp. 3d 81 (D. Mass. 2018), *appeal filed*, No. 18-2235 (1st Cir. Dec. 18, 2018); *Rodriguez v. Brown*, No. 2:18-cv-001422, 2018 WL 6136140 (C.D. Cal. Sept. 21, 2018), *appeal filed*, No. 18-56281 (9th Cir. Sept. 28, 2018).

[5] Specifically, the plaintiffs asked the court to (1) "enjoin Defendants from selecting Electors under the challenged WTA system, or any other system that fails to treat each Texas citizen's vote for the President in an equal manner, including selection by Congressional District vote"; (2) "set reasonable deadlines for state authorities to propose and then implement a method of selecting Electors that treats each Texas citizen's vote for the President in an equal manner, making clear that such a system *cannot* include selection by Congressional District vote"; and (3) "if state authorities fail to propose or implement a valid method of selecting Electors," the plaintiffs sought an injunction ordering "a proportional method of distributing Electors, selecting a proportional number of Electors to each party, based on the number of votes each party's candidate receives statewide."

No. 19-50214

## II.

On appeal, the plaintiffs maintain that Texas's WTA structure for appointing presidential electors violates the one-person, one-vote principle rooted in the Equal Protection Clause, as well as First and Fourteenth Amendment associational rights.[6] We review the dismissal under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Quinn v. Guerrero*, 863 F.3d 353, 362 (5th Cir. 2017).

## III.

According to the plaintiffs, "the Constitution establishes a two-stage election for President." "In the first stage, the Constitution requires the states to select Electors." "In the second stage, the Electors selected by the state cast the only effective votes for President allowed by the Constitution." The plaintiffs contend that WTA violates one-person, one-vote at both stages. At the first stage, WTA violates precedent "h[olding] that states may not use at-large voting schemes for members of a multi-member body to minimize or cancel out the voting strength of minority voters." "[B]y assigning all 38 of its electoral votes to the winner of a plurality of the votes at the second stage, Texas further dilutes Plaintiffs' votes, discarding their votes *for President* in order to magnify the influence of the plurality on the Presidential election."

To survive the motion to dismiss, however, the plaintiffs' claim must not be foreclosed by controlling precedent. One giant barrier stands in their way: *Williams v. Va. State Bd. of Elections*, 288 F. Supp. 622 (E.D. Va. 1968), *aff'd*, 393 U.S. 320 (1969) (per curiam).

In *Williams*, a three-judge panel rejected a one-person, one-vote

---

[6] The plaintiffs don't raise their vote-dilution claim under section 2 of the Voting Rights Act, which is now waived. *See United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) (per curiam).

challenge to Virginia's WTA structure for selecting presidential electors. *Id.* at 623. The panel concluded that appointing electors on a WTA basis did not result in "the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection." *Id.* at 627. The court reasoned,

> In the selection of electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote. Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes. This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious. No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone.

*Id.* The Supreme Court summarily affirmed. *Williams*, 393 U.S. at 320.

As a general matter, summary affirmances "reject the specific challenges presented" and "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). Nevertheless, "[a] summary disposition affirms only the judgment of the court below, and no more may be read into [the Court's] action than was essential to sustain that judgment." *Anderson v. Celebrezze*, 460 U.S. 780, 785 n.5 (1983). "Just as with the Court's other precedential opinions, lower courts should assume they are bound by summary decisions until such time as the Court informs them that they are not." *Price v. Warden*, 785 F.3d 1039, 1041 (5th Cir. 2015) (cleaned up). With that in mind, the district court found "no material factual distinctions or intervening doctrinal shifts that militate [*Williams*'s] binding precedential nature."

The plaintiffs assert that the district court erred in holding that *Williams* controls, because *Williams* didn't address the plaintiffs' argument that, as in *Gray v. Sanders*, 372 U.S. 368 (1963), WTA discards the plaintiffs' votes for

President. That theory is flawed. The *Williams* plaintiffs based their claims on *Gray*, which the Court had decided six years earlier. *See Williams*, 288 F. Supp. at 626 ("Principal reliance for [the plaintiffs'] argument is the 'one-person, one-vote' doctrine announced in Gray . . . ."). Moreover, the *Williams* plaintiffs made a nearly identical one-person, one-vote challenge to a functionally indistinguishable WTA system. Unsurprisingly, every district court to confront the plaintiffs' argument has held that *Williams* controls.[7]

The plaintiffs also assert that *Williams* isn't dispositive because subsequent legal developments have abrogated it. That assertion likewise is without merit, especially considering that the Court "has admonished the lower federal courts to follow its directly applicable precedent, even if that precedent appears weakened by pronouncements in its subsequent decisions, and to leave to the Court 'the prerogative of overruling its own decisions.'" *Randell v. Johnson*, 227 F.3d 300, 301 (5th Cir. 2000) (per curiam) (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

The first critical doctrinal shift that postdates *Williams*, according to the plaintiffs, is *White v. Regester*, 412 U.S. 755 (1973). The plaintiffs point out that "[i]t was not until *White* . . . that the Court would hold an at-large election for multiple members of a multi-member body violated the Fourteenth

---

[7] *See Baten*, 374 F. Supp. 3d at 568–70 (rejecting the plaintiffs' argument that subsequent developments in law overrule *Williams*); *Lyman*, 352 F. Supp. 3d at 88 ("In short, in light of the absence of any material factual difference or doctrinal shifts, the Court concludes that the Supreme Court's summary affirmance in *Williams* is binding precedent that requires dismissal of the plaintiffs' claims."); *Rodriguez*, 2018 WL 6136140, at *4 ("Plaintiffs' equal protection claim under the Fourth Amendment is foreclosed by *McPherson* and *Williams* and fails as a matter of law."); *see also Conant*, 248 F. Supp. 3d at 1025 ("*Williams* is still good law and Plaintiff offers no basis for distinguishing it."); *Schweikert v. Herring*, No. 3:16-CV-00072, 2016 WL 7046845, at *2 (W.D. Va. Dec. 2, 2016) ("[T]he Court is not permitted to reach a conclusion opposite the precise issues presented in *Williams*."); *Hitson v. Baggett*, 446 F. Supp. 674, 676 (M.D. Ala.) (citing *Williams* in rejecting a constitutional challenge to Alabama's WTA scheme for selecting presidential electors), *aff'd*, 580 F.2d 1051 (5th Cir. 1978) (table).

No. 19-50214

Amendment." The plaintiffs overstate the relevance of *White* as it relates to *Williams*. At issue in *White* was Texas's 1970 reapportionment plan for its House of Representatives. *Id.* at 756. The Court reversed the three-judge district court's holding that a 9.9% variation in population between districts established a *prima facie* equal protection claim. *Id.* at 763. The Court then affirmed the district court's finding that two multi-member districts were "used invidiously to cancel out or minimize the voting strength of racial groups." *Id.* at 765. The Court's holding was limited, and it noted that "[p]lainly, under our cases, multimember districts are not *per se* unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts in other parts of the State." *Id.*

*White*'s holding thus dealt with race-based vote dilution, which is consistent with *Williams*'s holding that discrimination against a political minority does not violate one-person, one-vote, because "in a democratic society the majority must rule, unless the discrimination is invidious." *Williams*, 288 F. Supp. at 627. The plaintiffs do not allege that Texas's WTA system was adopted to cancel out the voting strength of any particular group. Consequently, *White* does not implicitly overrule *Williams*.

Contrary to the plaintiffs' contentions, *Bush v. Gore* also doesn't overrule *Williams*. That case involved a unique application of the one-person, one-vote rule that had nothing to do with WTA. In it, the Court reaffirmed that "the state legislature's power to select the manner for appointing electors is plenary; it may, if it so chooses, select the electors itself, which indeed was the manner used by state legislatures in several States for many years after the framing of our Constitution." *Bush*, 531 U.S. at 104. "Having once granted the right to vote on equal terms," however, "the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.*

at 104–05. The Court then ruled that the recount procedures adopted by the Florida Supreme Court treated voters arbitrarily and disparately because the "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." *Id.* at 106.

The plaintiffs contend that *Bush v. Gore* eliminated the invidiousness requirement in one-person, one-vote claims. That is incorrect. Dating back as far as *Williams*, the Supreme Court has recognized two types of one-person, one-vote violations: one based on arbitrary and disparate treatment of voters, the other invidious discrimination.[8] *Bush v. Gore* dealt with a challenge to the arbitrary and disparate treatment of voters, not invidious discrimination. Moreover, several Supreme Court cases postdating *Bush v. Gore* continue to reference an invidiousness requirement for discrimination claims.[9]

Even if we assume that *Bush v. Gore* has precedential value—despite an express pronouncement that Court's "consideration [was] limited to the present circumstances," 531 U.S. at 109—and that it altered the one-person, one-vote landscape, it did not overturn *Williams*. *Bush v. Gore* dealt with the arbitrary and disparate treatment of voters, whereas in *Williams*, all of Virginia's voters participated in the election on equal terms. The Court in *Bush v. Gore*

---

[8] *See, e.g., Roman v. Sincock*, 377 U.S. 695, 710 (1964) (explaining that the Constitution requires "faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness *or* discrimination" (emphasis added)); *see also Clements v. Fashing*, 457 U.S. 957, 967 (1982) ("Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution.").

[9] *See, e.g., Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1307 (2016) ("We have further made clear that minor deviations from mathematical equality do not, by themselves, make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." (quotation marks omitted)).

No. 19-50214

had no reason to discuss or reference *Williams*, much less overturn it. And the "Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio.*" *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

## IV.

Because *Williams* did not confront an argument that appointing presidential electors through a WTA system violates freedom of association, we must address the substance of those claims.[10] The plaintiffs aver that WTA burdens their right (1) to a meaningful vote, (2) to associate with other voters, and (3) to associate with candidates and petition electoral representatives. The district court dismissed those contentions and held that the plaintiffs hadn't stated a cognizable burden. Other district courts have held the same.[11]

The plaintiffs' first argument is that "by diluting votes at the first stage and discarding votes at the second stage, WTA violates Plaintiffs' right to cast an *effective* vote." But the plaintiffs don't allege infringement of ballot access. Nor do they contend that they were unable to cast a vote for their preferred choice, the "prime objective of most voters in associating themselves with a particular party." *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973). To the contrary, all votes were weighted equally, and all eligible voters were able to vote for

---

[10] *See Mandel*, 432 U.S. at 176 ("Summary affirmances . . . prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions."). *But see Rodriguez*, 2018 WL 6136140, at *4 ("Because the Supreme Court summarily affirmed a state's use of the WTA method in selecting presidential electors as constitutional in *Williams*, the Court also grants Defendants' Motion to dismiss Plaintiffs' associational rights claim under the First and Fourteenth Amendment.").

[11] *See Lyman*, 352 F. Supp. 3d at 91 ("[T]he plaintiffs' complaint does not allege an associational burden for purposes of a First Amendment claim."); *Baten*, 374 F. Supp. 3d at 570 ("[T]he plaintiffs have not sufficiently alleged that the rights of voters to associate in any manner or to engage in any political activity or association have actually been burdened."); *cf. Rodriguez*, 2018 WL 6136140, at *4 (dismissing plaintiffs' claim as foreclosed by *Williams*).

their preferred candidates.

The plaintiffs next assert that "WTA burdens Plaintiffs' rights to associate with their party for the election of presidential candidates." They reason that WTA "negates the ability of Texas Democrats to associate in a way analogous to that of extreme forms of partisan gerrymandering" because "even if they are highly successful in associating for the election of their chosen presidential candidate, Texas Democrats will predictably receive zero electoral votes." The Supreme Court has recognized the right of individuals to associate by voting for their preferred political party, as well as the right of political parties to define their membership, set policy objectives, and select candidates to represent them. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357–58 (1997); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986). Nevertheless, "[t]he First Amendment right to associate and to advocate provides no guarantee that a speech will persuade or that advocacy will be effective." *Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464–65 (1979) (per curiam) (quotation marks omitted). Additionally, the plaintiffs were able to translate common principles into concerted action by voting for Democratic presidential candidates.

Finally, the plaintiffs assert that Texas's WTA system gives an incentive to national candidates and elected officials to ignore Texas's voters and focus on "swing states." They allege that WTA consequently renders their votes and voices meaningless. The plaintiffs, however, produce no caselaw or legal reasoning to justify that as a cognizable burden. Moreover, there is a critical distinction between a system that diminishes voters' motivation to participate and one that burdens their ability to do so. Although WTA may indirectly decrease the incentive of members of perennially losing political parties to vote, it does not hinder their actual ability to vote.

10

More generally, the plaintiffs do not allege any harms suffered "by reason of their view[s]." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring in the judgment).  Instead, any disadvantage they allege is solely a consequence of their lack of electoral success.  But "the function of the election process is to winnow out and finally reject all but the chosen candidates." *Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (quotation marks omitted). "Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently." *Id.*

Democratic elections necessarily result in winners and losers.  The frustration of losing, however, does not violate the Constitution.  The judgment of dismissal is AFFIRMED.