**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL RODRIGUEZ; ROCKY CHAVEZ;
LEAGUE OF UNITED LATIN
AMERICAN CITIZENS; CALIFORNIA
LEAGUE OF UNITED LATIN
AMERICAN CITIZENS,
*Plaintiffs-Appellants*,

v.

GAVIN NEWSOM,* in his official
capacity as Governor of the State of
California; ALEX PADILLA, Secretary
of State of California, in his official
capacity as Secretary of State of the
State of California
*Defendants-Appellees.*

No. 18-56281

D.C. No.
2:18-cv-01422-
CBM-AS

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted March 3, 2020
Pasadena, California

---

* Gavin Newsom is substituted for his predecessor, Edmund G.
Brown, Jr., as Governor of the State of California. Fed. R. App. P.
43(c)(2).

Filed September 8, 2020

Before:  Consuelo M. Callahan and Jacqueline H. Nguyen, Circuit Judges, and Dana L. Christensen,[**] District Judge.

Opinion by Judge Nguyen

## SUMMARY[***]

### Civil Rights

The panel affirmed the district court's dismissal of a complaint which alleged that California's winner-take-all approach to selecting its presidential electors violates the equal protection and First Amendment rights of California residents who, like appellants, usually do not vote for the State's popular vote winner and thus enjoy no representation among the State's electors.

The panel held that appellants' equal protection challenge was foreclosed by *Williams v. Virginia State Board of Elections*, a decades-old opinion that was summarily affirmed by the U.S. Supreme Court.  288 F. Supp. 622 (E.D. Va. 1968), *aff'd*, 393 U.S. 320 (1969), *reh'g denied*, 393 U.S. 1112 (1969).  The panel joined the three sister circuits to have considered the issue in holding that, under *Williams*, a State's use of the winner-take-all approach

---

[**] The Honorable Dana L. Christensen, United States District Judge for the District of Montana, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

(WTA) to select its presidential electors is consistent with the Constitution's guarantee of equal protection. The panel rejected appellants' arguments that post-*Williams* cases involving multimember districts raised doubts regarding *Williams*'s continued viability, or that *Gray v. Sanders*, 372 U.S. 368, 381 (1963), a Supreme Court case that predated *Williams*, controlled rather than *Williams*.

The panel held that appellants failed to plausibly allege that California's use of WTA to select presidential electors violates the First Amendment. The panel rejected appellants' contentions that the WTA system burdened their right to cast their votes effectively, to associate with like-minded voters across the State, and to petition their government and associate with the candidates of their choice. Moreover, the panel held that even assuming appellants had plausibly alleged the State's use of WTA imposed some minimal burden, their claims would still fail. Any burden was—at most—minimal, and California had identified an important interest: maximizing the impact of the State's electors within the Electoral College.

## COUNSEL

David Boies (argued), Boies Schiller Flexner LLP, Armonk, New York; James P. Denvir III, Amy J. Mauser, Karen L. Dunn, Lisa Barclay, Amy L. Neuhardt, Hamish P.M. Hume, and Katherine M. Cheng, Boies Schiller Flexner LLP, Washington, D.C.; Trevor P. Stutz, Boies Schiller Flexner LLP, Los Angeles, California; Luis Roberto Vera Jr., LULAC National General Counsel, Law Offices of Luis Vera Jr., San Antonio, Texas; Jennier D. Hackett, James R. Martin, and Allison M. Vissichelli, Zelle LLP, Washington, D.C.; David H. Fry and J. Max Rosen, Munger Tolles &

Olson LLP, San Francisco, California; Michael B. Desanctis, Munger Tolles & Olson LLP, Washington, D.C.; Scott A. Martin, Irving Scher, and Jeanette Bayoumi, Hausfeld LLP, New York, New York; Michael D. Hausfeld and Swathi Bojedla, Hausfeld LLP, Washington, D.C.; Samuel Issacharoff, New York, New York; Mark Guerrero and Mary Whittle, Guerrero & Whittle PLLC, Austin, Texas; Randall L. Allen, Alston & Bird LLP, Atlanta, Georgia; Maria Amelia Calaf, Jack A. Simms Jr., Ryan A. Botkin, Katherine P. Chiarello, Karen S. Vladeck, and W. Reid Wittliff, Wittliff Cutter Austin PLLC, Austin, Texas; for Plaintiffs-Appellants.

P. Patty Li (argued), Deputy Attorney General; Paul Stein, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Defendants-Appellees.

## OPINION

NGUYEN, Circuit Judge:

The State of California, like forty-seven other States and the District of Columbia, employs a winner-take-all ("WTA") approach to selecting its presidential electors. Under this system, the State awards all of its electors to the political party of the popular vote winner in the State, regardless of relative vote share. Appellants, a coalition of voters in California, appeal the district court's dismissal of their lawsuit. They allege that WTA violates the equal protection and First Amendment rights of California residents who, like them, usually do not vote for the State's

popular vote winner and thus enjoy no representation among the State's electors.

Appellants' equal protection challenge is foreclosed by *Williams v. Virginia State Board of Elections*, a decades-old opinion that was summarily affirmed by the U.S. Supreme Court. 288 F. Supp. 622 (E.D. Va. 1968), *aff'd*, 393 U.S. 320 (1969), *reh'g denied*, 393 U.S. 1112 (1969) ("*Williams*"). We join our three sister circuits to have considered the issue[1] in holding that, under *Williams*, a State's use of WTA to select its presidential electors is consistent with the Constitution's guarantee of equal protection. We also conclude that Appellants have failed to plausibly allege that California's use of WTA to select presidential electors violates the First Amendment. We therefore affirm.

## I.

### A.

Article II of the U.S. Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ." U.S. Const. art. II, § 1, cl. 2. "Article II, § 1's appointments power gives the States far-reaching authority over presidential electors, absent some other constitutional constraint." *Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020). The Twelfth Amendment adds that the electors "shall meet in their

---

[1] *Baten v. McMaster*, 967 F.3d 345 (4th Cir. 2020); *Lyman v. Baker*, 954 F.3d 351 (1st Cir. 2020); *League of United Latin Am. Citizens v. Abbott*, 951 F.3d 311 (5th Cir. 2020).

respective states and vote by ballot for President and Vice-President . . . ."  U.S. Const. amend. XII.

California, like all but two states,[2] awards all of its electors to the party of the candidate who wins the popular vote in the State.  *See* California Elections Code §§ 6901, 6902, 6906, 15400, 15452, 15505.  We are asked to decide whether this method for selecting electors—WTA—is constitutional.

## B.

Appellants are self-identified Republican and third-party voters in California.  They sued then-Governor of California Jerry Brown and California Secretary of State Alex Padilla (collectively "California" or "the State"), contending that the State's use of WTA infringes their "constitutional right to an equal vote in the presidential election."  Their core theory is that WTA "counts votes for a losing presidential candidate . . . only to discard them in determining [e]lectors who cast votes directly for the presidency."  They allege that in so doing, WTA "unconstitutionally magnifies the votes of a bare plurality of voters by translating those votes into an entire slate of" electors "while, at the same time, the votes cast for all other candidates are given no effect."  This, according to Appellants, violates the principle of "one person, one vote."  Appellants further contend that WTA burdens various First Amendment rights.

The district court dismissed Appellants' complaint with prejudice, holding that their equal protection challenge was

---

[2] In Maine and Nebraska, "two electors go to the winner of the statewide vote and one goes to the winner of each congressional district."  *Chiafalo*, 140 S. Ct. at 2321 n.1.

"foreclosed by" *McPherson v. Blacker*, 146 U.S. 1 (1892), and *Williams*.   *Williams*, it noted, held that "a state's selection of presidential electors on a 'winner take all basis' does not violate the 'one person, one vote' principle of the Fourteenth Amendment because '[i]n the selection of electors, the [winner take all] rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote.'"   The district court further determined that *Williams* also foreclosed Appellants' First Amendment claims.

## II.

We review de novo the district court's dismissal of a complaint alleging a violation of constitutional rights.  *See United States v. Adams*, 388 F.3d 708, 710 (9th Cir. 2004).  To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1048 (9th Cir. 2012) (citation omitted).

## III.

### A.

The Constitution does not prescribe how States select electors.  To the contrary, it "conceded plenary power to the state legislatures in the matter . . . ." *McPherson*, 146 U.S. at 35; *see also id.* at 27 (explaining the Constitution "recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object").  But a State's method for selecting electors must comport with equal protection principles. *Chiafalo*, 140 S. Ct. at 2324 n.4; *cf. McPherson*, 146 U.S. at 40 (concluding that "no

discrimination is made" in a system for selecting electors where "each citizen has an equal right to vote"); *see also Williams v. Rhodes*, 393 U.S. 23, 29 (1968) ("*Rhodes*").

Equal protection requires, "as nearly as is practicable," that one person's vote "be worth as much as another's." *Wesberry v. Sanders*, 376 U.S 1, 7–8 (1964); *see also Gray v. Sanders*, 372 U.S. 368, 381 (1963) (describing the principle of "one person, one vote"). However, "[i]t hardly follows . . . that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019).[3]  "[E]ach vote must carry equal weight"—but "[t]hat requirement does not extend to political parties." *Id.*  That is, it is not required "that each party . . . be influential in proportion to its number of supporters." *Id.*

### B.

Over a century ago, the Supreme Court considered an equal protection challenge to a Michigan law providing for the selection of electors by district. *McPherson*, 146 U.S. at 24.  The Court rejected the challenge, *id.* at 27–36, but it did not opine on any *other* system for selecting electors, *see Williams*, 288 F. Supp. at 626 (explaining *McPherson* "did no[] more than hold permissible and valid Michigan's determination to select electors by districts").  *McPherson* thus does not weigh heavily in our analysis.

---

[3] *Rucho* involved the application of the "one-person, one-vote" principle to partisan gerrymandering claims.  Although factually inapposite, the case offers an instructive explication of the "one-person, one-vote" principle.

But *Williams* does.  The plaintiffs in *Williams* challenged a Virginia law providing that "all of the State's electors [were to be] collectively chosen . . . by the greatest number of votes cast throughout the entire State . . . ."  *Id.* at 623.  The ballot included "the name of each political party and the nominees thereof for President and Vice President," as well as "the names of [each] party's elector candidates . . . ."  It "permit[ted] a voter to vote only for one or another political party, and thus for the party's nominees for President and Vice President."  And a "vote cast [for a given party] . . . constitute[d] . . . one vote for each of the 12 electors listed thereon under the name of th[at] party and its nominees."  Thus, all of the State's electors were selected—as a group—according to the popular vote in the State, and all of the electors represented one political party.

The plaintiffs argued that the law was unconstitutional "because it g[ave] the choice of all of the electors to the statewide plurality of those voting in the election—'winner take all'—and accord[ed] no representation among the electors to the minority of the voters."  *Id*.  This "general ticket" method, according to the plaintiffs, "violate[d] the 'one-person, one-vote' principle of the Equal Protection Clause . . . ."  *Id.* at 624.

The three-judge panel disagreed.  Virginia's use of WTA did not "come within the brand of" the Supreme Court's "one-person, one-vote" decisions because the "system [wa]s but another form of the unit rule," which is not "offensive to the Constitution."  *Id.* at 626–27 (noting the election of the president by the House when no majority is obtained in the electoral college is by unit); *see also id.* at 628 (quoting *Wesberry*, 376 U.S at 7) (explaining it had previously held constitutional the practice of electing members of the House

as a unit, whereby "two or more or all are running at large, that is statewide").

The court acknowledged "possible objectionable results" from the use of WTA, including that "as much as 49 percent of a State's voters may see the portion of its electoral votes attributable to them cast for a candidate whom they oppose," thus "wast[ing]" their votes. *Id.* at 627. But any "deprivations imposed by the unit rule" did not "equate . . . with the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection":

> In the selection of electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote. Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes. This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious. No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone.

*Id.*

The court also explained that Virginia's use of WTA was "grounded on what ha[d] historically been deemed to her best interests in the workings of the electoral college." *Id.* at 628. Faced with a choice of "appointing electors in a manner [that would] fairly reflect the popular vote" or "allow[ing] the majority to rule and thereby maximize the impact of Virginia's 12 electoral votes," Virginia chose the

latter. *Id.* And in the court's view, the decision was "[]not . . . unwise[]." *Id.* In sum, the Virginia law "d[id] not disserve the Constitution . . . ." *Id.* at 629.

*Williams*'s applicability is obvious: like Virginia did, California awards all of its electors to the party of the candidate who wins the popular vote in the State. Appellants raise an equal protection challenge, contending WTA "discard[s]" the "votes for a losing presidential candidate" in the selection of electors. *Cf. id.* at 627 (considering the argument that WTA in Virginia "wasted" the votes "cast for a loser"). Appellants concede that *Williams* "addressed an argument similar to [Appellants'] vote dilution argument here."

That *Williams* was affirmed by the Supreme Court in summary fashion does not obviate its binding effect here, as summary affirmances "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977); *United States v. Blaine County, Montana*, 363 F.3d 897, 904 (9th Cir. 2004) (explaining the "Supreme Court's summary affirmances bind lower courts"). Indeed, after the Court summarily affirms a lower court decision declaring a law unconstitutional, "other courts [are] not free to conclude that the [law] invalidated [is] nevertheless constitutional." *Mandel*, 432 U.S. at 176. The same is surely true, too, for laws declared to be constitutional.

The Supreme Court's summary affirmance of *Williams* thus controls—unless "subsequent developments suggest otherwise" or this case does not involve the "precise issues presented and necessarily decided" in *Williams*. *Id.*; *Blaine County*, 363 F.3d at 904. Appellants argue that both exceptions apply. We disagree.

## C.

## 1.

Appellants argue that post-*Williams* cases involving multimember districts raise doubts regarding *Williams*'s continued viability.**[4]**  They suggest that California's presidential election can be viewed as an election for fifty-five electors who constitute a multimember (state-level) body.  And under this view, according to Appellants, WTA violates Appellants' equal protection rights by diluting their votes.

Appellants rely on *White v. Regester*, a case in which the Supreme Court affirmed a judgment invalidating certain multimember districts, for the proposition that a state cannot "cancel out or minimize the voting strength" of minority voters.  412 U.S. 755, 765 (1973); *see also Burns v. Richardson*, 384 U.S. 73, 88 (1966).

But Appellants oversimplify the standard.  In *White*, the Court explained that "multimember districts are not per se unconstitutional . . . ."  412 U.S. at 765.  Rather, they are unconstitutional only when "used *invidiously* to cancel out or minimize the voting strength" of a minority group.  *Id.* (emphasis added).  Further, "it is not enough that the [minority] group . . . has not had legislative seats in proportion to its voting potential."  *Id.* at 765–66.  The group must "produce evidence . . . that the political processes leading to nomination and election *were not equally open to participation* by the group"—"that its members *had less opportunity* than did other residents in the district *to*

---

**[4]** A multimember district is a district in which multiple candidates are elected to represent the district, usually based on plurality voting.

*participate in the political processes* and to elect legislators of their choice."**5** *Id.* at 766 (emphases added).

This case does not directly fall within the ambit of *White* because Appellants have not alleged invidious discrimination. What they have alleged is that their votes are impermissibly diluted because they do not enjoy proportional representation among the State's electors—but that is "not enough." *Id.* at 765–66; *see also Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971) ("[W]e are unprepared to hold that district-based elections decided by plurality vote are unconstitutional in . . . multi-member districts simply because the supporters of losing candidates have no legislative seats assigned to them.").

Further, any discrimination inherent in WTA is not invidious because "[e]very citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone." *Williams*, 288 F. Supp. at 627. Thus, even if the selection of California's electors could be framed as the election of a multimember district and post-*Williams* multimember district cases constituted a "subsequent development,"**6** the cases would not undermine *Williams*.

---

**5** The Court relied on a plethora of findings regarding "the history of official racial discrimination in Texas." *Id.* at 766–69 (noting that "Mexican-Americans in Texas . . . had long 'suffered from, and continue[d] to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others'" (citation omitted)).

**6** We do not generally "conclude [the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). If Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [we] should follow the case which directly controls,

Another purported "subsequent development" is that federal law has changed since *Williams* regarding "unit" voting for members of the House. As discussed above, *see supra* Part III.B., in *Wesberry* the Supreme Court affirmed the constitutionality of voting for representatives by unit. *Williams*, 288 F. Supp. at 628. The *Williams* court found it "notable that Congress . . . ha[d] [also] . . . countenanced" the practice. *Id.* Appellants point out that Congress has since changed the law to require that states use single-member districts for congressional elections. *See* 2 U.S.C. § 2c. This is correct but the change in law is immaterial to the constitutionality of unit voting.

The last "subsequent development" is a purported doctrinal shift toward eliminating the requirement of invidiousness. Appellants argue the Supreme Court has "clarified that, although invidiousness may be relevant to certain challenges, . . . there are electoral systems that are sufficiently arbitrary in their treatment of voters that no showing of invidiousness is required." *See Bush v. Gore*, 531 U.S. 98, 104–05 (2000)). The *Bush* Court found an equal protection violation due to "arbitrary and disparate treatment"; it did not discuss whether the discrimination was "invidious." *Id.*

We are not persuaded. First, the precedential value of *Bush* is limited. *See id.* at 109 ("Our consideration is limited to the present circumstances . . . ."). Second, it is unlikely the Court would have silently changed a fundamental feature of its voting rights equal protection jurisprudence. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1,

leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

18 (2000). Indeed, even before *Williams* the Court noted that equal protection requires "faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness *or* discrimination." *Roman v. Sincock*, 377 U.S. 695, 710 (1964) (emphasis added). Third, *Williams*'s approval of WTA was based on a finding of non-invidiousness *and* a finding of non-arbitrariness. *See Williams*, 288 F. Supp. at 628 (characterizing Virginia's use of WTA as "historically . . . deemed to [be in the State's] best interests" and "[]not . . . unwise[]").

Appellants also identify factual differences between *Williams* and this case, but the differences are immaterial. In Virginia, Appellants emphasize, electors' names were on the ballot; by contrast, the California ballot today lists only the candidates and their parties. But in Virginia the electors' names were associated with candidates and political parties, and the inclusion of such names on the ballot does not appear to have affected the court's analysis. Further, Appellants note that, unlike in California today, the electors in Virginia had no legal obligation to support their parties' nominees. But the distinction is irrelevant: how electors *vote* is different from how they are *selected*, *cf. Chiafalo*, 140 S. Ct. at 2321–22, and, in any event, Virginia's electors voted—as would be expected—for their parties' nominees, *Williams*, 288 F. Supp. at 626 (noting that in the 1960 election, Virginia voters split 52.4% to 47% but the Republican nominee "was credited with 100% [o]f Virginia's electoral votes"). California's current system for selecting electors is thus substantively identical to Virginia's at the time of *Williams*.

We thus hold, as three of our sister circuits recently likewise have held, that *Williams* controls and forecloses Appellants' equal protection claim. *Baten*, 967 F.3d at 355–

56 (following the reasoning of *Williams* in rejecting an identical equal protection claim because a summary affirmance "prevent[s] lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by" the case summarily affirmed (citation omitted)); *Lyman*, 954 F.3d at 366 (concluding that *Williams* "require[d] the dismissal" of an identical equal protection claim because it "decide[d] the core equal protection issue presented"); *League of United Latin Am. Citizens*, 951 F.3d at 315–17 (characterizing *Williams* as a "giant barrier stand[ing] in the[] way" of an identical equal protection claim).

**2.**

Appellants also argue that *Gray*, a Supreme Court case that predated *Williams*, controls rather than *Williams*. In *Gray*, the Supreme Court struck down the Georgia Democratic Party's ("GDP") primary election system. The system was based on "county unit[s]": the GDP assigned each county a certain number of units, and the candidate who received the most votes in a given county was awarded all of the county's units.**[7]** *Gray*, 372 U.S. at 370–71. The effect of the system was to weight counties disproportionately. *Id.*

---

**[7]** In other contexts, "general ticket" or "unit" voting refers to a single bloc (such as the group of electors in *Williams*). In *Gray*, each county was assigned multiple "units," each of which functioned like an elector.

Originally, each county received two units for each of its representatives in Georgia's House of the General Assembly. *Gray*, 372 U.S. at 371. Later, the law was amended to resemble a "bracket system," whereby counties were allotted units in rough proportion with their populations. For example, counties with 0 to 15,000 residents were allotted two units, with an additional unit allotted for the next 5,000 people. *Id.* at 372. The Court rejected both forms. *Id.* at 381 & n.12.

at 373 (explaining that counties constituting one-third of the State's population enjoyed a "clear majority of county units"); *see also id.* at 379 (explaining that the system "weight[ed] the rural vote more heavily than the urban vote and weight[ed] some small rural counties heavier than other larger rural counties"). The Court held the system unconstitutional, *id.* at 381, and then further specified in a footnote that the district court had properly enjoined the use of the system, even in its amended form:

> The county unit system, even in its amended form[,] . . . would allow the candidate winning the popular vote in the county to have the entire unit vote of that county. Hence the weighting of votes would continue, even if unit votes were allocated strictly in proportion to population. Thus if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded.

*Id.* at 381 n.12.

Appellants read *Gray* as having two distinct holdings: first, the disproportionate allocation of units was unconstitutional; and second, the system would be unconstitutional even if units were allocated proportionately because the winner of a county would be awarded all of the county's units.

Appellants focus on the second holding, arguing the system *Gray* described is similar to California's. Appellants contend that in California, just as in *Gray*, the presidential

election is "conducted in two steps: at the first step, each state receives a set number of electoral votes and conducts an election to allocate those votes; and at the second step, those votes are tallied to determine the President." And just as in *Gray*, a losing candidate's votes are "discarded" in California before they can affect the election. Appellants further argue that this "two-step" structure is distinguishable from the structure in *Williams*, which comprised a single step: a "vote for [e]lectors."

We reject Appellants' attempt to distinguish *Williams* by way of analogy to *Gray*. WTA in California is, for the reasons discussed above, materially identical to the system in *Williams*—and *Williams* was decided after *Gray*.[8] There is little to support Appellants' argument that California's system is similar to *Gray*'s (a purported "two-step" system) but different from *Williams*'s (a purported "one-step" system). Nothing in *Gray* supports such a reading and, more importantly, the system in *Williams* was essentially the same as those in California *and Gray*—whether characterized as one-step or two-step.[9] Just as in *Gray* and in California today, the system in *Williams* involved Virginia's "receiv[ing] a set number of electoral votes and conduct[ing]

---

[8] *Williams* also specifically rejected a "one-person, one-vote" argument based on *Gray*. *Williams*, 288 F. Supp. at 626. Although *Williams* did not discuss *Gray*'s footnote 12, the holding in that footnote would have been the one (of the purported two holdings in *Gray*) more relevant to *Williams*.

[9] Appellants' purported distinction between *Williams*'s WTA system, on the one hand, and *Gray*'s and California's, on the other, is that *Williams* "rest[ed] on the premise that voters vote for *[e]lectors*" because the electors' names were on the ballot and the electors were not required to vote for a particular candidate. Those distinctions were not material to the court's reasoning in *Williams*, nor do they meaningfully distinguish *Williams*'s system from California's.

an election to allocate those votes," and then "tall[ying]" the votes "to determine the President."

Further, the analogy to *Gray* falls short.[10] *Gray*'s central concern was the presence of geographic discrimination in the GDP's primary election system. *Gray*, 372 U.S. at 379. That concern extended to *Gray*'s footnote 12:

> [I]n [*Gray*], . . . we h[e]ld that the county-unit system would have been defective even if unit votes were allocated strictly in proportion to population. We noted that if a candidate received 60% of the votes cast in a particular county he would receive that county's entire unit vote, the 40% cast for the other candidates being discarded. *The defect, however, continued to be geographic discrimination. Votes for the losing candidates were discarded solely because of the county where the votes were cast.* Indeed, votes for the winning candidate in a county were likewise devalued, because all marginal votes for him would be discarded and would have no impact on the statewide total.

*Gordon v. Lance*, 403 U.S. 1, 4–5 (1971) (citing *Gray*, 372 U.S. at 381 n.12) (emphasis added). We have similarly interpreted *Gray*. *See Angle v. Miller*, 673 F.3d 1122, 1129–30 (9th Cir. 2012) (citing *Gray*, 372 U.S. at 381 n.12) ("*Gray* and *Gordon* suggest that, with respect to a statewide

---

[10] We recently rejected an attempt to "take a single sentence in [*Gray*] . . . and transform it into a new voting rights principle . . . ." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1026 (9th Cir. 2016) (en banc).

election, a state must count votes on a statewide, rather than a district-by-district, basis. Doing otherwise devalues votes based on where voters happen to live.").

No comparable concern about geographic discrimination exists here. Appellants claim their votes are "discarded *because* they live in California, and it is the *California* Democratic Party that benefits and takes advantage of a two-step election involving defined geographical units to consolidate votes." But the Court's concern in *Gray* was that votes in Georgia were treated differently based on the voters' location within the state; in California, all votes are treated equally regardless of where they are cast.

## IV.

Appellants allege that a WTA system burdens their First Amendment rights to cast their votes effectively, to associate with like-minded voters across the State, and to petition their government and associate with the candidates of their choice.

No First Amendment challenge was brought in *Williams*. Because Appellants' First Amendment claims do not implicate the "precise issues presented and necessarily decided" in *Williams*, *Mandel*, 432 U.S. at 176, *Williams* does not control them. But we may affirm on any ground supported by the record, *ASARCO, LLC v. Union Pacific Railroad Co.*, 765 F.3d 999, 1004 (9th Cir. 2014), and, because Appellants do not state a claim, we affirm.

## A.

"[E]ach and every citizen has an inalienable right to full and effective participation in the political process[] . . . ." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). That includes

the right to "cast [one's] votes effectively," which requires that no voter be "denied an opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters." *Dudum v. Arntz*, 640 F.3d 1098, 1106, 1109 (9th Cir. 2011) (citation omitted).

Appellants go further, asserting that their right to full and effective participation precludes the "diluting and discarding" associated with WTA. But Appellants offer no support for stretching this right beyond its plain meaning and established precedents.[11] Because Appellants can participate fully in California's presidential election, including voting for their preferred candidates, their right to cast an effective vote is not burdened.

## B.

"The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986) (citations omitted).

---

[11] Citing *Rhodes*, Appellants argue that California's use of WTA "removes their 'basic incentive' for participating in the presidential election at all." But in *Rhodes*, Justice Harlan decried a statutory scheme that denied voters "any opportunity to participate in the procedure by which the President is selected." *Rhodes*, 393 U.S. at 41 (Harlan, J., concurring). Here, by contrast, Appellants have every opportunity to participate in the State's presidential election.

Another case cited by Appellants, *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 216 (1986), held that a statute restricting a political party's ability to open its primary to non-members "limit[ed] the [p]arty's associational opportunities."

According to Appellants, WTA burdens their right to "associate with like-minded voters" by "distort[ing] the electoral process": "those who do not support the Democratic candidate in California have little reason to drum up support for a candidate who will receive zero electoral votes . . . ." In these types of cases, the Supreme Court has "focused on the [challenged] requirements themselves, and not on the manner in which political actors function under those requirements." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 205 (2008). And WTA does not limit Appellants' ability to associate with like-minded voters. At base, Appellants contend they are *not incentivized* to associate, not that they *cannot*.[12]

## C.

The right to petition "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011). More generally, it "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Id.* at 388. But this right is uni-directional; it does not require government officials or politicians to

---

[12] *Gill v. Whitford*, 138 S. Ct. 1916 (2018), cited by Appellants, is inapposite. In *Gill*, Justice Kagan articulated a theory of associational harm in the context of partisan gerrymandering. She posited that a partisan gerrymander may infringe the associational rights of the members of a "disfavored party" by "depriv[ing] [them] of their natural political strength," thus creating challenges with respect to "fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates." *Id.* at 1938–39 (Kagan, J., concurring). But partisan gerrymandering is different than selecting electors with WTA; only the former is closely connected to the problems with party infrastructure that Justice Kagan identified.

respond, or even listen, to citizens. *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979) (holding that "the First Amendment does not impose any affirmative obligation on the government to listen [or] to respond," nor does it "guarantee that a speech will persuade or that advocacy will be effective" (quotation marks and citation omitted)).

Appellants theorize that WTA causes presidential candidates to "ignore California's minority voters in each election cycle," which "undermines the core relationship . . . between constituents and their representatives." But Appellants again mistakenly focus on the incentives that flow from WTA. The issue is whether WTA burdens Appellants by limiting their ability to petition, not whether WTA changes politicians' behaviors. *See Lopez Torres*, 552 U.S. at 205. Appellants do not allege any restrictions on their ability to petition.

### D.

Even assuming Appellants had plausibly alleged the State's use of WTA imposed some minimal burden, their claims would still fail. Under *Burdick v. Takushi*, 504 U.S. 428 (1992), a "flexible standard" applies to laws regulating the right to vote: we "must weigh 'the character and magnitude of the asserted injury' . . . against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (citations omitted). "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions[,]' . . . 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (citations omitted).

Any burden is—at most—minimal, and California has identified an important interest: "maximiz[ing] the impact of the State's electors within the Electoral College." WTA increases the voting power of the State within the electoral college, as all of its votes are cast in support of one candidate. And it also protects California against the use of WTA by the forty-seven other States that have adopted it. *Cf. Williams*, 288 F. Supp. at 626 (explaining that Thomas Jefferson recognized the merit of "protect[ing] his State against the use of [WTA] by other States" and relied on this justification in advising Virginia to adopt WTA, despite his preference for district-based selection of electors).

Appellants characterize California's interest as "illegitimate and incorrect." It is purportedly "illegitimate" because "WTA does not maximize the power of the State *as a whole*; instead, it maximizes the voting strength of a plurality of California voters." But Appellants conflate the intrastate and interstate effects of WTA; WTA maximizes the State's *interstate* power, and is thus not a "restatement of the very burden [Appellants] have identified." The interest is allegedly "incorrect" because WTA results in "presidential candidates generally ignor[ing] California voters," which "subverts the power of the State." Appellants again misconstrue the interest; it is to maximize the State's power in the *electoral college*, not to attract campaigns.

\*    \*    \*

Because Appellants fail to state a claim under either of their constitutional theories, we affirm the district court's dismissal of the complaint with prejudice.

**AFFIRMED.**